UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FATHIREE ALI #175762,

Plaintiff,

v

SUSAN KNIGHT, CHERYL PITTS, GREGORY TORREY, KIRSTEN LOSINSKI, and HEIDI WASHINGTON,

Defendants.

NO. 1:22-cv-287

HON. JANET T. NEFF

MAGISTRATE JUDGE
SALLY J. BERENS

Fathiree Ali #175762
*In Pro Per*
Saginaw Correctional Facility
9625 Pierce Road
Freeland, MI 48623

Jennifer A. Foster (P75947)
Assistant Attorney General
Attorney for Defendants
Michigan Dept. of Attorney General
Corrections Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
Fosterj15@michigan.gov

/

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Jennifer A. Foster (P75947)
Assistant Attorney General
Attorney for Defendants Knight, Pitts, Torrey, Losinski & Washington
Corrections Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
Fosterj15@michigan.gov

Dated: May 14, 2024

## CONCISE STATEMENT OF ISSUES PRESENTED

1. As a prerequisite to filing a lawsuit, prisoners are required to exhaust the administrative remedies process according to MDOC policy. Should this Court dismiss Plaintiff's retaliation claim and Director Washington because Plaintiff did not exhaust his administrative remedies?

2. In order to obtain injunctive or declaratory relief, Plaintiff must establish an ongoing violation of his rights. Should this Court grant Defendants' motion for summary judgment because Plaintiff is no longer confined at the facility where the alleged misconduct occurred, and Plaintiff's claims for injunctive or declaratory relief and his claims under RLUIPA are all moot?

3. The Eighth Amendment prohibits cruel and unusual punishments. Should Defendants be granted summary judgment because Plaintiff did not allege an Eighth Amendment claim in the body of his amended complaint, and thus, cannot establish that any Defendant violated his Eighth Amendment rights?

4. To establish an equal protection claim, Plaintiff must show that he was similarly situated in every material way to individuals who received a benefit that he was denied. Should this Court grant Defendants summary judgment because Plaintiff cannot prove the necessary elements of his claim?

5. For a First Amendment retaliation claim, a Plaintiff must demonstrate with record evidence that he was engaged in protected conduct, suffered an adverse action that would deter a person of ordinary firmness, and show a causal connection between the two. Should the Court grant summary judgment because Plaintiff cannot establish that any Defendant retaliated against him?

6. Under § 1983, Plaintiff must establish the violation of a constitutional right and show how each Defendant, through the official's own individual actions, participated in conduct that violates the Constitution. Should Defendants' motion for summary judgment be granted because Plaintiff cannot establish a constitutional violation, or that any Defendant was personally involved in violating his constitutional rights?

7. Qualified immunity protects officials who carry out discretionary decision-making authority unless they knowingly violate the law. Should this Court grant Defendants qualified immunity, either because there was no constitutional violation, or existing law at the time would not have provided notice beyond debate, that Plaintiff's own willingness to work in the kitchen would violate his constitutional rights?

8. Should this Court decline jurisdiction over Plaintiff's state law claims, either because Plaintiff has not established a federal claim, or because the state claims are barred by immunity?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Authority*: Fed. R. Civ. P. 56

*Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014)

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019)

*Rizzo v. Goode*, 423 U.S. 362 (1976)

*Shehee v. Lutrell*, 199 F.3d 295 (6th Cir. 1999)

*Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 Fed. Appx. 826 (6th Cir.2009)

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999)

## STATEMENT OF FACTS

Plaintiff filed a complaint on March 28, 2022, against several Michigan Department of Corrections (MDOC) officials including the Classification Director, the Food Service Director, two Food Service Supervisors, and the MDOC. (Compl., ECF No. 1, PageID.2.) The alleged violations arose while confined at Lakeland Correctional Facility (Lakeland) (*id.*, PageID.5–9), and Plaintiff is now confined at Saginaw Correctional Facility.[1] He alleged violations of the First Amendment Free Exercise Clause and Retaliation, the Eighth Amendment, the Fourteenth Amendment Equal Protection Clause, the Religious Land Use and Institutionalized Persons Act (RLUIPA), the Michigan Constitution, and sought declaratory, injunctive, compensatory and punitive relief. (*Id.*, PageID.9.) On March 5, 2024, Plaintiff filed an amended complaint removing the MDOC, and adding in Director Heidi Washington. (Am. Compl., ECF No. 30, PageID.120–133.) Plaintiff's amended complaint references the same alleged constitutional and statutory violations. (*Id.*)

Plaintiff claims that he is a devout Muslim and is "prohibited from handling or distributing haraam [sic] (i.e., unlawful, forbidden) foods for consumption." (*Id.*, ¶ 17, PageID.123.) But when Plaintiff was transferred to Lakeland, he was assigned to food service by the Classification Director, Defendant Losinski, and Plaintiff says Defendants' "wrongful interpretation and implementation of PD

---

[1] Michigan Department of Corrections, Offender Information Tracking System, Profile Fathiree Ali #175762, https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=175762

05.01.100" coerced and compelled Plaintiff to handle haram food as part of his work duties. (*Id.*, ¶ 77, PageID.132.) Plaintiff told each Defendant that his beliefs "prohibited him from serving any haraam [sic] foods" (*id.*) but Defendants "consciously, knowingly and intentionally calculated a design to oppress or intimidate Ali's religious practice in violation" of his rights. (*Id.*, ¶ 33, PageID.126.)

All prisoners who get transferred to Lakeland go through the same classification process. (Ex. A, Aff. Losinski, ¶ 4–5, 10, 16.) As long as they are medically cleared to work and not otherwise taking school classes, each is placed into a work assignment pool that covers institutional needs. (*Id.*, ¶ 3–4.) This pool filled open assignments for the kitchen, unit porter, and recreation worker. (*Id.*, ¶ 4.) When a work assignment opened in one of those areas, the next prisoner whose name was on the list, was placed in that position. (*Id.*, ¶ 5.) After six months of successfully working in the institutional pool, they can request a more desirable work assignment. (*Id.*, ar. 6.) Lakeland uses this method for work assignments "because Lakeland has a large lifer population who do not change jobs often. If [they] allowed everyone coming to the facility to pick their own work assignment, the wait pool for the most desirable work assignments would be extensive, effectively allowing a prisoner not to work for a long period of time without any consequences." (*Id.*, ¶ 7.) This method of assignment "keeps the process fair for everyone and allows [Lakeland] to fill less desirable positions to help run the facility." (*Id.*, ¶ 8.) When the open position came up in food service, Plaintiff's name was the next one on the list. (*Id.*, ¶ 9.) All prisoners who start in food service, start

from the same place — serving in the dining room. (*Id.*, ¶ 10.) Then as other positions open, based on experience and seniority, prisoners in the kitchen have the opportunity to change and do something different. (*Id.*) The process is the same for everyone. (*Id.*, ¶ 4–5, 10, 16.)

Defendant Pitts was a food steward, tasked with completing Plaintiff's orientation into food service. (Ex. B, Aff. Pitts, ¶¶ 2, 5.) During that orientation process, Plaintiff informed Defendant Pitts that he could not serve foods that violated his religious beliefs. (*Id.*, ¶ 6; Am. Compl., ECF No. 30, ¶ 26, PageID.125.) Defendant Pitts had no control over work assignments, but completes orientations as assigned and oversees prisoner workers in the kitchen during the day. (Ex. B, Aff. Pitts, ¶ 8.) She contacted Food Service Director, Defendant Torrey, and Torrey indicated that Plaintiff could serve items on the line that did not violate his religious beliefs. (*Id.*, ¶ 7.) Plaintiff still refused, and at that time, Plaintiff even refused to sign his orientation training acknowledgements. (Ex. C, Work Rec's.) When Defendant Pitts informed Defendant Torrey of Plaintiff's refusal to sign his orientation, Plaintiff claims that Defendant Torrey threatened to punish him with "OO" status if he refused to work. (Am. Compl., ECF No. 30, PageID.26.) Double-O status references the section of policy 05.01.100, which explains consequences of receiving unemployable status. (*Id.*, ¶ 23, PageID.124.) At the time the allegations arose, the alphabetic paragraph citations had changed, but the substance remained the same.

"A prisoner may be reclassified as unemployable and therefore be ineligible for a work or an education program assignment" if the "prisoner refused to accept, or fails to fully and actively participate in, a work assignment[.]" (Ex. D, PD 05.01.100, ¶ BB.) Refusing to sign orientation papers is the equivalent of refusing the work assignment. (Ex. A, Aff. Losinski, ¶ 13.) "Prior to being reclassified as unemployable, appropriate staff shall ensure the prisoner understands the consequences of that action[.]" (Ex. D, PD 05.01.100, ¶ CC.) "Prisoners classified as unemployable shall not be permitted to participate in any more leisure time activities than those who work full time. Prisoners classified to unemployable status shall be permitted to attend primary religious services and approved holy day observances but shall not be permitted to attend other religious activities[.]" (*Id.*, ¶ DD.) "Prisoners classified as unemployable . . . shall be considered for reclassification every 30 calendar days until a reclassification is complete." (*Id.*, ¶ FF.)

Defendant Torrey referred Plaintiff back to classification, and informed classification that Plaintiff had been told about Double-O status. (Ex. C, Work Rec.'s; Am. Compl., ECF No. 30, ¶ 27, PageID.125.) Prisoners are not forced to work and have the option to sign off any work assignment. (Ex. B, Aff. Pitts, ¶ 9; Ex. E, Aff. Torrey, ¶ 10.) As Defendant Pitts explained, she must inform every prisoner who comes to food service that they can refuse the assignment, but she is required to tell them of Double-O status as part of the training. (*Id.*, 9–11.) Plaintiff then claims that Defendant Losinski "threatened him with penalties if he did not work,

and do whatever he was told." (Am. Compl., ECF No. 30, ¶ 27, PageID.125.) Plaintiff claims that all the Defendants incorrectly interpreted this policy (*id.*, ¶ 25, PageID.125); however, because of Defendants' alleged threats, Plaintiff complied and worked in food service against his "sincerely held religious beliefs." (*Id.*, ¶ 31–32, PageID.126.)

On December 21, 2018, Plaintiff says that Defendant Knight "assigned him to serve haraam [sic] foods to a prison population of seventeen hundred." (*Id.*, ¶ 29, PageID.125–126.) Plaintiff explained during his deposition, that it did not matter what spot on the serving line he worked, all spots would violate his religious beliefs. (Ex. F, Dep. Trans. 39:17–40:7.) This is so, because Lakeland places the main course meal on the plate first, and Plaintiff says he is prohibited from even taking a plate that has haram food on it and passing it to another person. (*Id.*) It does not matter if he was not the one who put the haram food on the plate. (*Id.*) He cannot pass it to anyone else for consumption. (*Id.*) Likewise, if Plaintiff was asked to take a box that contained haram meat and carry it to the serving line, he could not do that because he is aware that the meat is going to be served to others. (*Id.*, 31:15–18.) He may not assist in serving haram food to anyone, in any manner.

Later, on December 21, Plaintiff says Defendant Pitts came in to relieve Knight, but made him continue serving on the line. (Am. Compl., ECF No. 30, ¶ 29, PageID.126.) Defendant Pitts had no authority over prisoner work assignments in the kitchen but was there to monitor the workers during the day. (Ex. B, Aff. Pitts, ¶ 8.) Plaintiff claims "over the next 60 days, three times per/day suffered mental

and physical abuse[.]" (Am. Compl., ECF No. 30, ¶ 32, PageID.126.) Records show Plaintiff was assigned to food service five days per week from December 21, 2018, until February 8, 2019, a total of 49 days. (Ex. C, Work Rec.'s.)

## ARGUMENT

### I. Plaintiff failed to exhaust administrative remedies for each claim and Defendant.

Exhaustion of administrative remedies is a prerequisite to filing a prisoner lawsuit under the PLRA. This requirement is mandatory, *Woodford v. Ngo*, 548 U.S. 81, 85 (2006), and grounded in the plain language of the Prisoner Litigation Reform Act. 42 U.S.C. § 1997e(a). This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes" and regardless of the wrong alleged. *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Failure to exhaust all administrative remedies as to any claim, or any defendant, warrants summary judgment dismissing the claim and/or defendant without prejudice. *Jones v. Bock*, 549 U.S. 199, 219-224 (2007).

#### A. Exhaustion requires compliance with MDOC Policy.

The standard for determining whether Plaintiff satisfied the requirement to exhaust, is whether he fully complied with all steps in the MDOC grievance policy. See *Woodford*, 548 U.S. at 90 (recognizing that exhaustion requires following all steps set forth in agency policy and doing so properly.) "The level of detail necessary in a grievance to comply with the grievance procedures will vary from

system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 219.

### B. MDOC Policy requires that a grievant follow specific procedure and provide detailed facts about the issues being grieved.

The required administrative process is found in MDOC Policy Directive 03.02.130, "Prisoner/Parolee Grievances" (Ex. G, PD 03.02.130.) Before writing a grievance, the prisoner must attempt to resolve the issue with the staff member involved within two business days of becoming aware of a grievable issue. (*Id.* ¶ P.) If the matter does not get resolved, the prisoner can file a Step I grievance and must include the relevant facts with "[d]ates, times, places, and names of all those involved in the issue being grieved." (*Id.* ¶ P, R, V.) If still not resolved, the prisoner can file a Step II grievance, and finally a Step III grievance for consideration by MDOC staff outside the prison facility. (*Id.* ¶ FF.)

### C. Plaintiff did not exhaust his retaliation claim or his claim against Defendant Director Washington.

Plaintiff filed his "grievance on the claims presented through all available steps by the MDOC" and his grievance was denied on March 26, 2019. (Am. Compl., ECF No. 30, ¶ 8, PageID.121.) The grievance Plaintiff submitted named Defendants Torrey, Pitts, Losinski, and Knight, and claimed only that he told them he could not handle haram foods, but they forced him to work in the kitchen, serving food in violation of his religious beliefs. (Ex. H, Grievance.) Nowhere does this grievance claim that Defendants' actions were retaliatory "[a]nd a prisoner must specifically grieve allegations of retaliation . . . against the defendants he

names in his complaint." *Garrett v. Mich. Dep't of Corr.*, No. 18-12845, 2019 U.S. Dist. LEXIS 131436, at *3 (E.D. Mich. 2019) (citing *Garrison v. Walters*, 18 Fed. Appx. 329, 2001 WL 1006271 (6th Cir.2001)).

Plaintiff claims Defendant Washington "is responsible for promulgating and [] enforcing policies and procedures throughout the Michigan Department of Corrections." (Am. Compl., ECF No. 30, ¶ 13, 35, PageID.123, 126.) "Defendant Washington, through its policymakers, maintains a custom and policy, set forth above, demonstrates deliberate indifference to the constitutional rights of its citizens." (*Id.*, ¶ 35, PageID.126.) Plaintiff does not mention Director Washington in the grievance he filed. (Ex. H, Grievance.) "Where a prisoner fails to name a Defendant in his Step I grievance, or mentions an individual who is involved for the first time during the Step III appeal of the denial of a grievance, the claim against that individual is not properly exhausted." *Mitchell v. Horton*, No. 2:18-cv-00216, 2020 U.S. Dist. LEXIS 136408, at *14 (W.D. Mich. 2020). Therefore, Plaintiff's claims of retaliation, and his claims against Director Washington are unexhausted, and should be dismissed as required by the PLRA.

## II. Plaintiff's RLUIPA claim and all requests for declaratory or injunctive relief are moot.

RLUIPA prevents the government from imposing a "substantial burden" on a prisoner's religious exercise "unless the government demonstrates that imposition of the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. §2000cc-1(a). RLUIPA was not intended to eliminate all burdens on religious exercise; it was only intended to eliminate "exceptional" burdens. *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005). Not every inconvenience a prisoner faces, amounts to a substantial burden.

Plaintiff's amended complaint was specifically against Defendants at Lakeland, whom Plaintiff believes incorrectly interpreted MDOC policy. "Defendants Knight, Pitts, Torrey and Losinski's wrongful interpretation and implementation of PD 05.01.100 to coerce and compel handling haraam [sic] food as part of Ali's work duties, is an unlawful and unconstitutional practice[.]" (Am. Compl., ECF No. 30, ¶ 77, PageID.131.) He claims they forced him to "defile himself by doing something completely forbidden by his religion" (*id.*, ¶ 44, PageID.128) and their "threats of retaliatory sanctions and coercion" forced Plaintiff not "to follow his sincerely held religious beliefs." (*Id.*, ¶ 45.) Plaintiff seeks a declaratory judgment, and relief through RLUIPA on behalf of all "arrestees and prisoners in the future." (*Id.*, ¶ 80(c).) Specifically, Plaintiff is asking this Court to enjoin "all named Defendants, Defendants agents, employees and successors, and all other person in active concert of participation with Defendants from forcing a prisoner – as part of his work duties – to handle or distribute foods that violate his religious beliefs." (*Id.*, ¶ 80(b).) Plaintiff also seeks compensatory and punitive damages, and reasonable attorney fees despite not having an attorney on this case. (*Id.*, ¶ 80(d–f.) Plaintiff cannot obtain the relief requested under RLUIPA, and this claim is moot.

Although Plaintiff did sue each Defendant in both an individual and personal capacity, Plaintiff does not distinguish which relief is requested for which claim. RLUIPA does not permit claims for money damages, only injunctive relief is available. *Haight v. Thompson*, 763 F.3d 554, 570 (6th Cir. 2014). Thus, to the degree Plaintiff seeks any monetary damages under RLUIPA, those claims must be dismissed. Additionally, Plaintiff is no longer confined at Lakeland where these claims arose. "[T]he Sixth Circuit has repeatedly held that claims against prison officials for both injunctive relief and declaratory relief are moot if the inmate is no longer at the facility where the alleged wrongdoing occurred." *Cook v. Cashler*, 2013 WL 1962388 at *3 (W.D. Mich., May 10, 2013) (citing *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir.2010); See also *Berryman v. Granholm*, 343 F. App'x 1, 4-5 (6th Cir. 2009).

Finally, to the degree that Plaintiff seeks to enjoin everyone within the MDOC for all prisoners in the future, Plaintiff cannot seek relief for anyone but himself. The Prison Litigation Reform Act provides, "in any civil action with respect to prison conditions [prospective relief] shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff[.]" 18 U.S.C. §3626. Plaintiff's requested relief would not be limited to Plaintiff, and thus, is not narrowly tailored as is required. Moreover, "no court can ma[k]e a decree which will bind anyone but a party; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal

service, and who therefore can have their day in court." *Swetland v. Curry*, 188 F.2d 841, 844 (6th Cir. 1951) (cleaned up.) See also *Sharpe v. Cureton*, 319 F.3d 259, 272 (6th Cir. 2003).

For these reasons, Defendants' motion for summary judgment should be granted as to Plaintiff's alleged RLUIPA violations and all claims for declaratory or injunctive relief.

## III. Plaintiff cannot establish an Eighth Amendment violation against any Defendant.

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). "The Eighth Amendment outlaws cruel and unusual 'punishments,' not 'conditions[.]'" *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Plaintiff's amended complaint does not address a substantive Eighth Amendment claim (Am. Compl., ECF No. 30, PageID.127–131), nor does Plaintiff seek relief for an alleged Eighth Amendment violation (*id.*, ¶ 131–132); but in the introduction, he mentions the Eighth Amendment as an alleged violation. (*Id.*, PageID.120.)

At the summary judgment stage, the liberal pleading standards no longer apply, *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407 F.3d 784,

788-89 (6th Cir. 2005), and this Court cannot construe Plaintiff's arguments for him. *Taul v. Tri Cty. Metro Narcotics*, No. 1:20-cv-00723, 2020 U.S. Dist. LEXIS 249878, at *5 (W.D. Mich. 2020). To the extent Plaintiff intended to allege an Eighth Amendment violation, "listing of various statutes and constitutional provisions does not give rise to a claim for which relief can be granted." *Tobias v. Michigan, Civil Action No*. 17-13759, 2018 U.S. Dist. LEXIS 119859, at *15 n.2 (E.D. Mich. 2018). Because Plaintiff did not allege and cannot establish facts that prove any Defendant violated his Eighth Amendment rights, Plaintiff cannot maintain an Eighth Amendment claim, and Defendants' motion for summary judgment should be granted.

## IV. Plaintiff cannot establish an Equal Protection claim against any Defendant.

The Equal Protection Clause says, "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV § 1. This is a mandate, "that all persons similarly situated should be treated alike." *Robinson*, 615 F. App'x at 314 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).) This means, Plaintiff must show that he was "similarly situated in all material respects" to others who gained a benefit that he was denied. *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 Fed. Appx. 826, 836 (6th Cir.2009). Additionally, "Plaintiff must show 'intentional and arbitrary discrimination' by the state; that is, he must show that he 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in

treatment.'" *Sparks v. Unknown Goodspeed*, No. 1:23-cv-639, 2023 U.S. Dist. LEXIS 139808, at *8 (W.D. Mich. Aug. 10, 2023) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)), see also *Abdullah v. Fard*, 173 F.3d 854 (6th Cir. 1999). Differential treatment alone, is not sufficient. *Maye v. Klee*, 915 F.3d 1076, 1085 (6th Cir. 2019). Plaintiff cannot establish an equal protection violation.

Plaintiff's amended complaint, alleges he "was denied equal access as similarly situated person[s] to the precepts all named Defendants' classification and religious policies, United States and Michigan Constitutions, and was treated unfairly and burdened by not being allowed to freely exercise his religious beliefs." (Am. Compl., ECF No. 30, ¶ 67, PageID.130.) This boils down to Plaintiff's belief that Defendants "wrongfully" interpreted and implemented the policy directive that covers unemployable status, 05.01.100. (*Id.*, ¶ 77, PageID.131.) Plaintiff says Defendants gave others "work duties in food service that did not compromise their beliefs, medical or age disabilities." (*Id.*, ¶ 28, PageID.125.)

Rather than seeking equal treatment, what Plaintiff is really seeking, is differential treatment. Plaintiff may not have understood the classification system used at Lakeland, but Plaintiff was not treated "unfairly," he was treated exactly like everyone else. (Ex. A, Aff. Losinski, ¶ 1–11, 16; Ex. E, Aff. Torrey, ¶ 9–10; Ex. B, Aff. Pitts, ¶ 4; Ex. I. Aff. Knight, ¶ 4.) At Lakeland, every prisoner who is cleared to work is initially placed into a pool of institutional needs. (Ex. A, Aff. Losinski, ¶ 3–4.) This list is not based on any discriminatory factors and operates neutrally by filling the next open work assignment, with the next name on the list. (*Id.*, ¶ 5.)

This method is also consistent with MDOC policy that requires the Classification Director "maintain a list of all institutional work assignments available to prisoners" and "ensure that prisoners are assigned in the same order they were placed in the pool." (Ex. D, PD. 05.01.100, ¶ Y.) This process removes any chance for discrimination and prevents other prisoners from believing someone received favoritism in a work assignment. Defendants Torrey, Knight, and Pitts have no control over Plaintiff's work assignment. (Ex. B, Aff. Pitts ¶ 8; Ex. E, Aff. Torrey, ¶ 7–8; Ex. I. Aff. Knight, ¶ 3, 7.) All work assignments originate with classification. (Ex. E, Aff. Torrey, ¶ 7–8; Ex. I. Aff. Knight, ¶ 3.) Food service staff also do not control prisoner requests for religious accommodations, but orient, train, and then supervise prisoners assigned to work in the kitchen. (Ex. B, Aff. Pitts ¶ 3, 8, Ex. E, Aff. Torrey, ¶ 8; Ex. I. Aff. Knight, ¶ 7.)

Most importantly, Plaintiff's vague and conclusory statement that Defendants "did not subject similarly situated person[s] to the same humiliation, discrimination, and different treatment as that Plaintiff was forced to suffer" is insufficient to create a material fact and overcome summary judgment. (Am. Compl., ECF No. 30, ¶ 68, PageID.130.) Lakeland does not circumvent this process for any able-bodied prisoner transferred to the facility. (Ex. A, Aff. Losinski, ¶ 3–8.) "To survive a summary judgment motion, a plaintiff must put forward more than speculations or intuitions." *Frazier v. USF Holland, Inc.*, 250 Fed. Appx. 142, 148 (6th Cir. 2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). Plaintiff was not treated differently than anyone else, and his allegations do not establish the purposeful discrimination that is required to maintain an equal protection claim. *Maye v. Klee*, 915 F.3d 1076, 1085 (6th Cir. 2019). Defendants' motion for summary judgment should be granted.

## V. Plaintiff cannot establish a First Amendment Retaliation claim.

As previously asserted, Plaintiff did not exhaust his administrative remedies regarding retaliation, but Plaintiff also cannot establish retaliation based on the facts presented. Under 42 U.S.C. §1983, Plaintiff must show (1) he engaged in protected conduct; (2) he suffered adverse action that would deter a person of ordinary firmness from continuing to engage in protected conduct; and (3) a causal link between the first two elements. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). The third element must be based on evidence; a "hunch" that he is being retaliated against, is not sufficient to sustain a claim. *Muhammad v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004). In *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019), the Supreme Court added that it is "not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 1722. Retaliation claims by prisoners must be scrutinized because they "are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Lindensmith v. Walton*, No. CV 14-13342, 2016 WL 398292, at *5 (E.D. Mich. 2016) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). Plaintiff must

establish each element of retaliation against each Defendant. *Celotex Corp.*, 477 U.S. at 322; *Rizzo v. Goode*, 423 U.S. 362 (1976). Plaintiff cannot establish any of the factors against any Defendant.

The protected conduct Plaintiff identifies seems to be "exercising his right of religious expression." (*Id.*) Plaintiff does not sufficiently identify his protected conduct, and not all conduct is protected. *Thaddeus-X*, 175 F.3d at 395. Plaintiff has a right to file grievances, and Plaintiff did file one grievance in this case; however, the grievance was filed after his orientation and after the alleged threat to place him on Double-O status. (Ex. H, Grievance; Am. Compl., ECF No. 30, PageID.120–133.) Thus, this grievance cannot form the basis of protected conduct. Plaintiff's complaint does not establish protected conduct for the purposes of a retaliation claim.

Plaintiff also cannot establish an adverse action. The complaint does not say that after he filed the grievance he received a misconduct report. (Am. Compl., ECF No. 30, PageID.120–133.) The complaint does not say that he was wrongfully placed on Double-O status. (*Id.*) Quite the contrary, although he refers to "threats," it appears none of the Defendants did anything more than make Plaintiff aware of a policy that could place him on unemployable status if he refused to work. (*Id.*, ¶¶ 23, 26–27, PageID.124–125.) Rather than being a retaliatory act, warning Plaintiff of potential consequences was mandatory — "Prior to being reclassified as unemployable, appropriate staff shall ensure the prisoner understands the consequences of that action." (Ex. D, PD 05.01.100, ¶ CC.) Plaintiff cannot

establish an adverse action. After being informed of potential consequences to his behavior, Plaintiff chose to work. (Am. Compl., ECF No. 30, ¶ 31, PageID.126.) Defendants did not force Plaintiff to do anything under threat; Plaintiff had a choice, and he made it. "[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims." *Robinson*, 2022 U.S. Dist. LEXIS 60164, at *27. (internal quotations omitted, quoting *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001)).

Plaintiff cannot identify any motivation by Defendants to retaliate against him, they simply did not give in and allow him to circumvent the work assignment system in place for all prisoners at Lakeland. Plaintiff cannot establish a causal connection. Plaintiff retaliation claims are conclusory allegations but "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009). Defendants' motion for summary judgment should be granted.

## VI. Plaintiff cannot establish a Free Exercise claim.

There is no question that prisoners retain constitutional rights that are not inconsistent with their status as a prisoner. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). This includes First Amendment rights related to freedom to practice their religion, although that freedom may be limited or restricted as long as the deprivation is in furtherance of legitimate penological interests. See *Turner v. Safley*, 482 U.S. 78, 89 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

"The constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 121 S. Ct. 1475, 1479 (2001). To demonstrate liability under §1983, a plaintiff must make a clear showing that each defendant was personally involved in the activity that forms the basis of the complaint. *Rizzo*, 423 U.S. 362; *Frazier*, 41 Fed. Appx. At 764. Liability must be based on active unconstitutional behavior. *Shehee v. Lutrell*, 199 F.3d 295, 300 (6th Cir. 1999).

### A. Plaintiff cannot establish a constitutional violation based on alleged misinterpretation of policy 05.01.100.

The Plaintiff alleges Defendants "wrongful interpretation and implementation of PD 05.01.100" coerced and compelled Plaintiff to handle haram food as part of his work duties. (Am. Compl., ECF No. 30, ¶ 77, PageID.131.) Plaintiff says that each Defendant used this policy to threaten Double-O sanctions if he refused to work. (*Id.*, ¶ 26–27, 31, PageID.125–126.) The referenced policy limits prisoners' leisure time between 8:00 a.m. and 4:00 p.m., during work hours, if a prisoner refuses a work assignment. (*Id.*, ¶ 23, PageID.124.) Noone wrongfully interpreted this policy. Nevertheless, when "considering a challenge to a prison policy as applied, the proper inquiry is whether the actions of the prison officials are reasonably related to legitimate penological interests." *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 103 (6th Cir. 1991). "To prevail, [Plaintiff] must overcome the presumption that the prison officials acted within their broad discretion." *Shaw,* 121 S. Ct. at 1481.

Policy Directive 05.01.100 states, in relevant part, "[w]ithin seven business day" of arriving to the facility, the Classification Director or designee must interview the prisoner to determine programing classification. (Ex. D, PD 05.01.100, ¶ G.) "All employable prisoners shall be classified to a work assignment unless assigned to education programs." (*Id.*, ¶ S.) "The Classification Director shall maintain a list of all institutional work assignments available to prisoners and, as necessary, a pool of eligible prisoners for each assignment. When a pool exists for an assignment and an opening occurs, the Classification Director shall ensure that prisoners are assigned in the same order they were placed in the pool." (*Id.*, ¶ Y.)

"Each prisoner shall be provided with a program classification review at least every six months." (*Id.*, ¶ L.) "A prisoner may be reclassified for any number of reasons, including but not limited to . . . The prisoner has demonstrated responsibility in a work assignment for at least six months and a more desirable assignment is being requested or recommended." (*Id.*, ¶ M(3).) Prisoners can also be reclassified based on institutional needs and resources. (*Id.*, M(7).) "Each prisoner requesting reclassification in accordance with this policy, or for whom a reclassification is recommended by a staff person, shall be interviewed by his/her RUM or designee. The RUM or designee shall discuss the request and/or recommendation with the prisoner and review the prisoner's progress toward program recommendations. The RUM or designee shall summarize the reasons for

the request and/or recommendation . . . including his/her recommendation, and notify the Classification Director of the need for review." (*Id.*, ¶ N.)

"A prisoner may be reclassified as unemployable" if "[t]he prisoner refused to accept, or fails to fully and actively participate in, a work assignment[.]" (*Id.*, ¶ BB(3).) "Prior to being reclassified as unemployable, appropriate staff shall ensure the prisoner understands the consequences of that action[.]" (*Id.*, ¶ CC.) "Prisoners classified as unemployable shall not be permitted to participate in any more leisure time activities than those who work full time. Prisoners classified to unemployable status shall be permitted to attend primary religious services and approved holy day observances but shall not be permitted to attend other religious activities[.]" (*Id.*, ¶ DD.) "Prisoners classified as unemployable . . . shall be considered for reclassification every 30 calendar days until a reclassification is complete." (*Id.*, ¶ FF.)

MDOC policy sets forth rules and restrictions regarding prisoner work assignments. Plaintiff's complaint shows that Defendants fully acted in conformity with the processes set forth in policy 05.01.100. (Am. Compl., ECF No. 30, PageID.120–133.) Defendant Losinski, as the Classification Director, maintained the work pools based on institutional needs, and she filled the open positions with the next name that came up on the list. (Ex. A, Aff. Losinski, ¶ 3–5.) Unlike other facilities, Lakeland's large lifer population, does not allow prisoners to come in and self-select work assignments. The waiting list for the most desirable positions would be long and permit prisoners to avoid the policy requirement that they work.

(*Id.*, ¶ 7.) Defendant Losinski's process is fully consistent with MDOC policy (Ex. D, PD 05.01.100, ¶¶ G, L–N, S, Y, BB–DD, FF), and is important, because without pools to fill institutional needs, it could affect prison operations and cause of a shortage of workers in less desirable work assignments. (Ex. A, Aff. Losinski, ¶ 7–8.) Plaintiff's amended complaint shows that each Defendant, as was required by policy, ensured Plaintiff knew the consequences if he decided to sign off the work assignment. (Am. Compl., ECF No. 30, ¶ 26–27, 30, PageID.125–126.) Because Plaintiff's complaint clearly establishes that each Defendant did exactly as the policy required, Plaintiff cannot establish that any of them misinterpreted or misapplied policy.

Compelling prisoners to work for institutional needs for a period of time, supports the effective operation of the institution, which in turn, supports safety and security which are all core, legitimate penological interests. *Meadows v. Hopkins*, 713 F.2d 206, 209–10 (6th Cir.1983).

**B. Plaintiff cannot prove any Defendant personally engaged in conduct to violate his rights.**

Plaintiff predominantly alleges that each Defendant took the exact same actions. (Am. Compl., ECF No. 30, PageID.123–131.) Plaintiff claims after Defendant Losinski gave him a work assignment in the kitchen, each Defendant coerced him to work. (*Id.*, ¶ 26–27, 30, PageID.125–126.) Specifically, Plaintiff claims he is "prohibited from handling or distributing haram (i.e., unlawful, forbidden) foods for consumption." (*Id.*, ¶ 17, PageId.123.) Plaintiff correctly

explains "[u]nder the MDOC policy, prisoners such as Ali are permitted to abstain from any food that violate their religious tenets." (*Id.*, ¶ 21, PageID.124.) This language is contained in the section of policy discussing the available diets within the MDOC, and the ability for prisoners to avoid eating foods that violate their beliefs. (PD. 05.03.150, ¶ RR.[2]) This does not apply to Plaintiff's allegations, which involve a work assignment.

Defendant Losinski used a neutral selection process, supported through policy, by which Plaintiff was assigned to the next available work position. (Ex. A, Aff. Losinski, ¶ 3–16.) Defendants Pitts and Torrey are both accused of warning Plaintiff about Double-O status — a mandatory conversation — and referring Plaintiff back to Defendant Losinski to discuss the matter. (Am. Compl., ECF No. 30, ¶ 26–27, PageID.125.) They had to refer Plaintiff back to Losinski, because no one in food service had authority to change Plaintiff's work assignment. (Ex. B, Aff. Pitts ¶ 8; Ex. E, Aff. Torrey, ¶ 7–8; Ex. I. Aff. Knight, ¶ 3, 7.) Defendant Losinski is accused of giving the same mandatory warnings that Pitts and Torrey gave Plaintiff. (Am. Compl., ECF No. 30, PageID.125.) Losinski uses the same formula for everyone to avoid favoritism and keep the process fair. (Ex. A, Aff. Losinski, ¶ 8–9.) If she allowed Plaintiff to avoid coming into the kitchen on the serving line, others who earned their positions through time, could be resentful, which could cause safety and security issues. (*Id.*, ¶ 8.) But regardless, Plaintiff agreed to work

[2] At the time the allegations arose, this section was located in policy at ¶ NN, the substance remains the same.

in the kitchen rather than sign off the assignment. (Am. Compl., ECF No. 30, ¶ 31, PageID.126.) After that, Defendant Knight is accused of forcing Plaintiff to serve food on the food line, as is Defendant Pitts. (*Id.*, ¶ 29, PageID.125–126.) Knowledge of Plaintiff's claims about his religious beliefs and a failure to remedy the issue, does not impose liability under §1983. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008.) Liability must be based on each Defendant's active unconstitutional conduct. *Shehee*, 199 F.3d at 300.

Even though prisoners retain constitutional rights, the constitution still allows restrictions on prisoners' actions. The MDOC is not required to permit demonstrative prayer during work assignments. *Johnson v. Newcomb*, No. 2:19-cv-00093, 2022 U.S. Dist. LEXIS 160878, at *10 (W.D. Mich. 2022). The prisons are not required to release prisoners from work assignments for religious activities outside their primary service. *O'Lone*, 482 U.S. at 353. Furthermore, making exceptions could be perceived as favoritism. *Id*. When it comes to work assignments, Plaintiff has no constitutional right to work, and has no right to any specific work assignment. see *Jones v. Brown*, 793 F.2d 1292 (6th Cir. 1986); *Argue v. Hofmeyer*, 80 F. App'x 427, 428 (6th Cir. 2003). He had the option to sign-off of any work assignment he believed went contrary to his religious beliefs. *Board v. Weston*, No. 2:19-cv-151, 2019 U.S. Dist. LEXIS 142449, at *3 (W.D. Mich. 2019); *Hardy v. Agee*, No. 2:13-cv-00230, 2018 U.S. Dist. LEXIS 220438, at *19 (W.D. Mich. 2018). Yes, as this Court has recognized, signing off a work assignment would mean for a while, Plaintiff could be confined to his cell during normal work

hours; yet being placed on unemployable status for 30 days and the restrictions that come with it, do not violate the constitution. *Id.*

In *Board*, a Muslim prisoner was given a kitchen work assignment and "explained his need to pray at the appropriate times" during the interview. *Board*, 2019 U.S. Dist. LEXIS 142449, at *2. He accepted the work assignment because he was assured his prayer would not be a problem. *Id.* He later learned that "under the rules, [he] could neither pray on the work site nor return to his cell." *Id.*, at *3. The official told the prisoner that if he "did not work without breaking for prayer" he would be fired and placed on "Double O" status. *Id.* He negotiated a different work schedule that would accommodate his prayer time, but then received a misconduct for failing to appear for work. *Id.* This Court dismissed *Board's* claims regarding RLUIPA and Free Exercise upon screening. *Id.*, at *22. The only claim that survived involved retaliation based on the misconduct report generated after the prisoner filed a grievance. *Id.*

In this case, Plaintiff did not receive a misconduct report, all warnings about Double-O status occurred prior to Plaintiff filing a grievance, and Plaintiff was not forced to violate his religious beliefs — he chose to work rather than be placed on unemployable status. (Am. Compl., ECF No. 30, ¶ 31, PageID.126.) Thus, based on his own allegations, it was Plaintiff's choice that violated his religious beliefs, not any action by any Defendant. Plaintiff cannot establish a Free Exercise violation, and Defendants' motion for summary judgment should be granted.

**VII. Defendants are entitled to qualified immunity either because there was no constitutional violation, or the right Plaintiff asserts was not clearly established beyond debate.**

Qualified immunity "is not just a defense, but an immunity to suit for money damages." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Gomez v. Toledo*, 446 U.S. 635 (1980). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotations omitted.) Based on *Ashcroft*, existing precedent must have placed the constitutional question "beyond debate." 563 U.S. at 741. The Supreme Court has said, "[i]t is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is 'clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah v. Bond*, 595 U.S. 9, (2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S. Ct. 577, 590 (2018)).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). There is a two-prong test, and a district court must view the issue of qualified immunity in the specific context of each case. The court can decide which of the two prongs of the

analysis should be addressed first "in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. One prong requires the court to consider whether the facts of the case, viewed in the light most favorable to the plaintiff, show that a constitutional right was violated. *Saucier*, 533 U.S. at 201. The other prong requires the court to decide whether that right was clearly established, "undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*

In this case, the Plaintiff alleges that Defendants violated his First Amendment rights by misinterpreting policy and coercing him to serve food that violates his religious beliefs. (Am. Compl., ECF No. 30, ¶ 26, 29, PageID.125–126.) But as established, Defendants did not coerce Plaintiff to work; he decided to work after being informed of consequences for not working. (*Id.*, ¶ 31, PageID.126.) The warnings each Defendant gave Plaintiff were mandatory and fully in compliance with MDOC policy. (Ex. D, PD 05.01.100, ¶¶ G, L–N, S, Y, BB–DD, FF.) Qualified immunity extends to "a prison official who relies on a facially valid regulation unless he knows or should know that the regulation violates a well-established constitutional right consisting of the particular act" that he prohibits. *Wolfel v. Morris*, 972 F.2d 712, 719-20 (6th Cir. 1992). This Court has already affirmed that unemployable status does not violate the constitution. *Board*, 2019 U.S. Dist. LEXIS 142449, at *3. Defendants reasonably relied upon this facially valid policy when they warned Plaintiff of the consequences of signing off the work assignment, and Defendants are entitled to qualified immunity.

### A. Established law at the time, would not put Defendants on notice that their actions would violate Plaintiff's constitutional rights.

Based on relevant case law at the time, Defendants would not have realized when Plaintiff chose to work instead of signing off the work detail, that his willing participation would cause any of them to violate his constitutional rights. Plaintiff claims he cannot serve food that violates his religious beliefs, which includes passing that food from one person to another. (Ex. F, Dep. Trans. 39:17–40:7.) None of the Defendants have ever had another prisoner make the religious claims Plaintiff made about his restrictions on serving food. (Ex. A, Aff. Losinski, ¶ 14; Ex. B, Aff. Pitts ¶ 6; Ex. E, Aff. Torrey, ¶ 5; Ex. I. Aff. Knight, ¶ 6.)

Additionally, Plaintiff's claim that he cannot even pass a tray that contains food against his religious beliefs, to someone else who does not hold the same religious beliefs, is far more restrictive. The neutral nature of work assignments, does not consider religious beliefs prior to placement, and "[p]rison officials are not required to accept a prisoner's bald assertion of religious faith." *Snyder v. Trudell*, No. 1:08-cv-10047, 2008 U.S. Dist. LEXIS 116292, at *33 (E.D. Mich. Sep. 25, 2008). "Without doubting the sincerity of Ali's own beliefs, it is easy to see the chaos which would ensue" if officials did have to consider claimed religious beliefs prior to giving work assignments as inmates' "religious scruples" could exempt them "from jobs that they did not like." *Ali v. Dewberry*, No. 6:10cv454, 2011 U.S. Dist. LEXIS 105349, at *13 (E.D. Tex. July 27, 2011).

Defendants have been unable to find any pertinent caselaw to put them on notice that passing trays on a serving line would violate Plaintiff's constitutional

rights. Defendants Knight, Pitts, and Torrey worked in food service and had no control over prisoner work assignments. (Ex. B, Aff. Pitts ¶ 8; Ex. E, Aff. Torrey, ¶ 7–8; Ex. I. Aff. Knight, ¶ 3, 7.) Nor did any of them force Plaintiff to work; he decided to work after properly being informed of unemployable status. (Am. Comp., ECF No. 30, ¶ 31, PageID.126.) Based on the specific facts of this case, Defendants are entitled to qualified immunity, and this motion for summary judgment should be granted.

## VIII. Michigan State Constitution

Plaintiff alleges that forcing him to work and serve food that violates his religious beliefs, violates Article 1, Section 4 of the Michigan Constitution. (*Id.*, ¶ 71–72, PageID.131.) To the extent Plaintiff's allegation is sufficient to state a cause of action, it would be a state law claim, not a federal claim intended for protections under 42 U.S.C. §1983. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 313–14 (6th Cir. 2005). The court may exercise supplemental jurisdiction over a state law claim when there is a legitimate claim for relief under §1983. Based on the allegations in the amended complaint, Plaintiff has not established a legitimate claim for relief under §1983 and, arguably, has failed to present a state law claim, and this Court should refuse to exercise supplemental jurisdiction.

Additionally, all Defendants are entitled to statutory immunity under MCL § 691.1407. "[E]ach officer and employee of a governmental agency, . . . acting on behalf of a governmental agency, . . . is immune from tort liability for an injury to a person . . . while in the course of employment . . . while acting on behalf of a

governmental agency." MCL § 691.1407(2). This portion of the statute provides Defendants with governmental immunity from tort liability, if their conduct "does not amount to gross negligence that is the proximate cause of the injury or damage." *Id*. at (2)(c).

In the amended complaint, Plaintiff did not show how any Defendants' conduct was "grossly negligent," nor did he allege so of any Defendant. (Am. Compl., ECF No. 30, PageID.120–133.) Since Defendants were acting within the scope of their employment for a state agency (*id.*, ¶ 10–13), the Defendants are entitled to immunity from tort liability under MCL 691.1407(2).

The same statute provides Director Washington absolute immunity because she is the highest appointive official of the MDOC. "A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." MCL § 691.1407(5). Washington's executive authority arises under MCL § 791.201. Consequently, Defendant Washington is entitled to absolute immunity from tort liability, and this Court should dismiss Plaintiff's state law claims.

## CONCLUSION AND RELIEF REQUESTED

Plaintiff cannot establish that any Defendant violated his constitutional rights, and Defendants' motion for summary judgment should be granted.

Respectfully submitted,

/s/ Jennifer A. Foster
Jennifer A. Foster (P75947)
Assistant Attorney General
Attorney for Defendants
Corrections Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
Fosterj15@michigan.gov

Dated: May 14, 2024

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES

### Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type Style Requirements

I, Jennifer A. Foster, hereby certify that:

1. This brief complies with the type-volume limitation of Local Civil Procedure Rule 7.2(b)(i), because, excluding the part of the document exempted, this brief contains no more than 10,800 words, as allowed for dispositive motions or responses. This document contains 7,703 words, as calculated by Microsoft Word 365.

2. This document complies with the typeface requirements of Local Civil Procedure Rules and the type-style requirements of Local Civil Procedure Rules because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook.

Jennifer A. Foster (P75947)
Assistant Attorney General
Attorney for Defendants
Corrections Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
Fosterj15@michigan.gov