UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FATHIREE ALI #175762,

        Plaintiff,                                 Hon. Jane M. Beckering

v.                                        Case No. 1:22-cv-287

SUSAN KNIGHT, et al.,

        Defendants.

_____/

**REPORT AND RECOMMENDATION**

Plaintiff, a prisoner presently incarcerated with the Michigan Department of Corrections (MDOC) at the Thumb Correctional Facility, has sued several MDOC employees pursuant to 42 U.S.C. § 1983 alleging claims based on events that occurred at the Lakeland Correctional Facility (LCF). In particular, Plaintiff sues LCF Food Service Supervisors Susan Knight[1] and Cheryl Palmateer (formerly known as Cheryl Pitts), LCF Food Service Director Gregory Torrey, LCF Classification Director Kirsten Losinski, and MDOC Director Heidi Washington. In his first amended complaint, Plaintiff alleges that Defendants violated the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.*, retaliated against him in violation of the First Amendment, subjected him to cruel and unusual punishment in violation of the Eighth Amendment, violated his right to equal protection under the Fourteenth Amendment, and interfered with his right to practice his religion as guaranteed by the First Amendment by wrongfully interpreting and implementing an MDOC policy to coerce and compel him to handle

---

[1] Defendant Knight is incorrectly named in this case as Susanne Knight.

haram food as part of his work duties in LCF food service. Plaintiff also alleges a state-law claim under the Michigan Constitution.

This matter is presently before me on Defendants' Motion for Summary Judgment. (ECF No. 36.) Plaintiff has responded to the motion (ECF No. 46), and Defendants have replied. (ECF No. 50.) In addition, Plaintiff was permitted to file a surreply limited in scope to the issue of the permanent restriction in the August 4, 2022 Health Work Assignment Clearance. (ECF Nos. 54 and 55.) Pursuant to 28 U.S.C. § 636(b)(1)(B), and for the reasons set forth below, I recommend that Defendants' motion be **GRANTED IN PART AND DENIED IN PART**. More specifically, I recommend that the motion be **granted** as to Plaintiff's RLUIPA, retaliation, Eighth Amendment, free exercise, and state-law claims and his equal protection claim against Defendants Knight, Palmateer, and Torrey but **denied** as to his equal protection claim against Losinski.

## I.  Background

Plaintiff is a devout Muslim and adherent of the Islamic faith. (ECF No. 30 at PageID.123.) He alleges that as a Muslim, he is "prohibited from handling or distributing haaram [sic] (i.e., unlawful, forbidden) foods for consumption." (*Id.*) Plaintiff alleges that the majority of Muslims, such as himself, believe that they are prohibited from aiding and abetting any conduct that Allah prohibits or making anything lawful that Allah has prohibited. (*Id.*) Plaintiff maintains that his religious beliefs not only prohibit him from consuming haram food, but also from serving haram food or even touching or passing a tray with a plate containing haram food to another because doing so will facilitate others' consumption of the prohibited food. (ECF No. 37-3 at PageID.222–24; ECF No. 50-8 at PageID.433–34.)

2

## A. MDOC's Prisoner Program Classification Policy Directive

The MDOC has adopted a Policy Directive governing prisoner program classification, which covers prisoner employment. Mich. Dep't of Corr. Policy Directive 05.01.100 (effective 11/01/2018). Under this policy, a facility's Classification Director is authorized to classify prisoners to program and work assignments, subject to review by certain MDOC officials. *Id.* ¶ E. Within seven days after a prisoner receives orientation at a facility, the Classification Director must interview the prisoner to determine his program classification. *Id.* ¶ G. The Classification Director must outline initial classification decisions and program referrals, enrollments, and terminations for each prisoner on a CSX-175 case plan. In addition, the Classification Director must notify appropriate staff whenever a prisoner is assigned to a work or program assignment. *Id.* ¶ J. The policy also provides that "[a] prisoner may be reclassified as unemployable and therefore be ineligible for a work . . . assignment" if "[t]he prisoner refused to accept, or fails to fully participate in, a work assignment . . . ." *Id.* ¶ BB(3). Prior to a prisoner being reclassified as unemployable, "appropriate staff shall ensure the prisoner understands the consequences of that action . . . ." *Id.* ¶ CC. A prisoner classified as "unemployable" remains on this status for 30 calendar days, at which point the prisoner may be considered for reclassification. The prisoner may remain on this status until reclassification is complete.[2] *Id.* ¶¶ EE, FF. A prisoner who is "classified as unemployable shall not be permitted to participate in any more leisure time activities than those who work full time." *Id.*¶ DD. They are permitted to attend primary religious services, but are not allowed to attend other religious activities. *Id.*

---

[2] Plaintiff incorrectly alleges that Policy Directive 05.01.100 provides that a prisoner shall remain on unemployable status for a minimum of 90 days (ECF No. 30 at PageID.124), as the policy actually provides that a prisoner reclassified as unemployable remains on that status for 30 days. Plaintiff correctly notes, however, that the policy restricts prisoners on unemployable status from engaging in leisure-time activities between the hours of 8:00 a.m.to 4:00 p.m.

**B.     LCF's Classification Process**

All prisoners who are transferred to LCF and able to work are required to have a work assignment or otherwise be enrolled in school. (ECF No. 37-2 at PageID.188–89.) Incoming Prisoners are processed through classification into an institutional needs pool that fills open food service, unit porter, and recreation worker positions. (*Id.* at PgeID.189.) When one of these positions becomes available, the next prisoner on the list is placed into that position. After working six months in an assignment, the prisoner may request to be classified to a more desirable work assignment. (*Id.*) LCF uses this process because its prisoners, many of whom are lifers, do not change jobs often. For this reason, allowing newly arriving prisoners to pick their own work assignments would be unworkable because the pool of prisoners waiting for their chosen positions to open up would be extensive, and allowing them not to work for long periods of time without consequences would hinder the facility's effective operation due to worker shortages. (*Id.*) Requiring prisoners to work assigned jobs based on institutional needs maintains fairness in the selection process and allows the facility to fill the less desirable positions. (*Id.*) In the food service area, all prisoners begin their work assignments on the serving line and may progress to other assignments from there, depending on a number of variables. (*Id.* at PageID.189–90.)

**C.     Plaintiff's Classification to Food Service**

Plaintiff arrived at LCF sometime prior to December 2018. In December 2018, Defendant Losinski, LCF's Classification Director, assigned Plaintiff to work in food service because he was next on the list in the pool when the position became available. (ECF No. 1 at PageID.3; ECF No. 30 at PageID.125; ECF No. 37-2 at PageID.189; ECF No. 50-8 at PageID.428.) When Plaintiff first learned of the opening, he told Losinski that a job in food service might conflict with his

religious beliefs. She responded that he should raise his concerns with food service, and they would schedule him according to his beliefs.[3] (ECF No. 46-2 at PageID.327.)

Defendant Palmateer, a Food Steward at LCF, conducted Plaintiff's orientation into food service in early December. (ECF No. 37-4 at PageID.199.) During the orientation, Plaintiff refused to sign a form containing medical questions and informed Palmateer that although he was willing to work, because of his religious beliefs, he could not work on the serving line. (ECF No. 30 at PageID.125; ECF No. 37-3 at PageID.194; ECF No. 46-2 at PageID.329; ECF No. 50-8 at PageID.429.) Plaintiff claims that Palmateer initially told him that it would not be an issue because Plaintiff would not have to handle anything that violated his religious beliefs.[4] (*Id.*; *see also* ECF No. 37-3 at PageID.194 (Palmateer stating that after Plaintiff informed her of his religious beliefs, she spoke to Defendant Torrey, who told her to complete the orientation and said that Plaintiff could be stationed to serve foods that did not violate his beliefs).) He alleges that Palmateer then left to speak to Defendant LCF Food Service Director Torrey about Plaintiff's objection and returned with Torrey shortly thereafter. Plaintiff alleges that Torrey told him that he would work and do as he was told, and if he failed to comply, he would receive a misconduct ticket and be subjected to "OO" sanctions—a reference to paragraph OO of the prior version of Policy Directive 05.01.100 specifying the consequences of being classified to "unemployable" status. (ECF No. 30

---

[3] Plaintiff did not allege these facts in his amended complaint. (ECF No. 30 at PageID.125.) In his deposition, Plaintiff testified that Losinski's clerk, who was also present, responded that wearing gloves while working in food service would accommodate Plaintiff's religious beliefs. (ECF No. 50-8 at PageID.427–28.)

[4] In his amended complaint, Plaintiff alleges that Palmateer responded that working on the serving line would not violate his religious beliefs because he would be required to wear gloves. (ECF No. 30 at PageID.125.) In contrast, in his post-deposition declaration, Plaintiff states that Palmateer first said that his "concerns were not a problem," but when Plaintiff told her he was not "on the vegan line," she told him "all bets are off." Plaintiff states that when he asked why, she said that he was making a big deal "out of this religious stuff" and told him that wearing gloves would resolve the issue. (ECF No 46-2 at PageID.329.)

5

at PageID.125; ECF No. 50-8 at PageID.436.)[5] Defendant Torry noted on Plaintiff's Prisoner Program and Work Assignment Evaluation that, due to Plaintiff's refusal to sign off on his orientation training materials, he was advised of the possibility of OO status. (ECF No. 37-4 at PageID.199.) Torrey thus referred Plaintiff back to Defendant Losinski to discuss his concerns about the job and OO status. (ECF No. 30 at PageID.125; ECF No. 36-6 at PageID.215; ECF No. 50-8 at PageID.437.)

Plaintiff met with Losinski again a few days later. Plaintiff told Losinski that he was not refusing to work in food service but that he could not work on the serving line because it would violate his religious beliefs. Plaintiff claims that Defendant Losinski told him that his job assignment was to work wherever he was needed and it was for food service to decide whether to accommodate him, but if food service did not accommodate him he still had to comply with the order to work on the food line. Plaintiff claims that, like Defendant Torrey, Defendant Losinski told him that if he refused to work and do whatever he was told to do he would receive a misconduct ticket and be placed on OO status. (ECF No. 30 at PageID.125; ECF No.50-8 at PageID.437.)

After speaking with Losinski, Plaintiff decided to accept the job assignment in food service. (*Id.* at PageID.438.) He reported to food service to begin his job on December 21, 2018. (ECF No. 30 at PageID.125–26.) While he was initially assigned to make toast, which did not present an issue, later that morning Defendant Food Service Supervisor Knight placed him on the serving line serving haram food. When Plaintiff told Knight that his religious beliefs prevented him from working on the serving line, Knight spoke with another woman in food service, because Torrey

---

[5] Plaintiff contradicts both his deposition testimony and his amended complaint allegations in his post-deposition affidavit when he states that neither "Torrey nor Pitts conveyed to me about [sic] any information or possibility of being Doubled [sic] 'OO.'" (ECF No. 46-2 at PageID.329.)

had not yet come into work. As a result, Knight told Plaintiff to comply with her instruction to work on the serving line. (*Id.*; ECF No. 50-8 at PageID.439–40.) When Palmateer reported to work later that day and relieved Knight, she had him continue on the serving line for both lunch and dinner. (ECF No. 30 at PageID.126.)

Plaintiff continued to work in food service five days per week until February 8, 2019, when his assignment was terminated. (ECF No. 37-4 at PageID.201.) During this time, Plaintiff performed other duties, including rolling silverware and cleaning tables. (ECF No. 50-8 at PageID.442.) However, he was usually required to work on the serving line, most of the time in the middle serving food other than meat. (*Id.* at PageID.441.)

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Where the moving party has the burden, "his showing must be sufficient for the court to hold that no reasonable trier of fact could

find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has emphasized that the party with the burden of proof "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561. Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### III. Discussion

#### A. Failure to Exhaust

Defendants first contend that Plaintiff's claims against Defendant Washington and his retaliation claims against all Defendants are subject to dismissal without prejudice for lack of exhaustion. The Supreme Court has held that a prisoner properly exhausts a claim for purposes of 42 U.S.C. § 1997e(a) by complying with the prison's "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006). In *Jones*, the Court reiterated:

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Jones v. Bock*, 549 U.S 199, 218 (2007). A prisoner incarcerated with the MDOC must "pursue a grievance through all three steps of the grievance process [set forth in MDOC Policy Directive 03.02.130]." *Weatherspoon v. Strahan*, No. 18-2210, 2019 WL 5306842, at *1 (6th Cir. June 4, 2019). This process must be completed at all levels prior to filing an action in federal court. *Freeman v Francis*, 196 F.3d 641, 645 (6th Cir. 1999).

Defendants support their motion with the grievance Plaintiff attached to his original complaint and referenced in his amended complaint, Grievance No. LCF-12-1257-20z (the 1257

Grievance), which Plaintiff alleged exhausted his claims. (ECF No. 1-1; ECF No. 37-9.) Plaintiff filed the 1257 Grievance on December 23, 2018, based on an incident date of December 21, 2018. He named Defendants Losinski, Torrey, Palmateer, and Knight and alleged that in spite of informing Defendants of his beliefs, which prevented him from serving or handling haram foods, they told him that the prison would discipline him for refusing orders to work on the serving line and handle or serve haram food items. He stated that on December 21, 2018, he was assigned to "toast detail," but Defendant Knight assigned him to serve a meat-based gravy on the food line. Plaintiff asserted that the actions of Defendants violated his free exercise rights, was cruel and unusual punishment, and violated his right to equal protection, as well as state and federal laws. (*Id.* at PageID.238.) The grievance was denied, as were Plaintiff's Step II and III appeals. (*Id.* at PageID.236–37, 239.)

Defendants first contend that Plaintiff's claims against Defendant Washington must be dismissed for lack of exhaustion because he failed to mention her in the 1257 Grievance. Plaintiff fails to respond to this argument. (ECF No. 46 at PageID.304.) The MDOC's grievance policy requires a grievant to name all the individuals involved in the issue they are grieving. Mich. Dep't of Corr. Policy Directive 03.02.130 (effective 07/09/2007). Under well-established Sixth Circuit law, a grievant's failure to name a defendant at Step I generally amounts to failure to properly exhaust administrative remedies. *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010); *see also Brown v. McCullick*, No. 18-2226, 2019 WL 5436159, at *3 (6th Cir. Apr. 23, 2019) (stating that "because Brown failed to name Rivard, McCullick, Parsons, and Williams at step I of this grievance, he failed to exhaust his claims against them"). Thus, the claims against Defendant Washington, which are unexhausted, are subject to dismissal without prejudice.

As for the retaliation claim, Defendants contend that Plaintiff failed to exhaust a retaliation claim because he did not claim that Defendants' acts were retaliatory. To exhaust a retaliation claim, a prisoner must include allegations of retaliatory conduct in his grievance to alert prison officials of such claim. *See Riggins v. Cook*, No. 2:20-cv-110, 2022 WL 816662, at *7 (W.D. Mich. Feb. 3, 2022), *report and recommendation adopted*, 2022 WL 815282 (W.D. Mich. Mar. 17, 2022) (plaintiff failed to exhaust retaliation claim by failing to raise retaliation at any point during the grievance process). "[A] prisoner must specifically grieve allegations of retaliation or conspiracy against the defendants he names in his complaint." *Garrett v. Mich. Dep't of Corrs.*, No. 18-12845, 2019 WL 6119431, at *1 (E.D. Mich. Mar. 8, 2019), *report and recommendation adopted*, 2019 WL 3561919 (E.D. Mich. Aug. 6, 2019). Defendants correctly note that Plaintiff did not mention retaliation in the section of the grievance instructing the grievant to "[s]tate problem clearly." He indicated only that Defendants' actions burdened his right to exercise his religion, amounted to cruel and unusual punishment, and violated his right to equal protection. Plaintiff also failed to include facts that would have alerted prison officials to the fact that Plaintiff was grieving retaliation. Plaintiff responds that his grievance adequately indicated that he was claiming retaliation because in the attempt-to-resolve portion of the Step I grievance, he stated that he was seeking redress concerning violations of his constitutional rights and requested that he "not be [subjected] to further retaliation." (*Id.* (citing ECF No. 37-9 at PageID.238).) However, that statement would not have necessarily notified prison officials that Plaintiff was claiming retaliation, particularly where nothing in the "problem" section of the grievance indicated that Plaintiff was claiming Defendants' acts and/or threats of disciplinary action were motivated by his assertion of his religious beliefs. Moreover, as Defendants note, nothing in the Step I response, which indicates that Plaintiff was interviewed about the grievance and would have been able to

10

clarify its basis, suggests that the respondent understood Plaintiff to be complaining of retaliation. (ECF No. 37-9 at PageID.239.) Accordingly, I recommend that Plaintiff's retaliation claim be dismissed without prejudice for lack of exhaustion.

### B.      RLUIPA Claim

Plaintiff alleges that Defendants violated RLUIPA by forcing him to handle and/or distribute haram foods, contrary to his sincerely held religious beliefs. (ECF No. 1 at PageID.128.) He alleges that "Defendants Knight, Pitts, Torrey and Losinski's wrongful interpretation and implementation of PD 05.01.100 to coerce and compel handling haram [sic] food as part of [Plaintiff's] work duties is an unlawful and unconstitutional practice[.]" (*Id.* at PageID.131.) He seeks declaratory relief and an injunction prohibiting Defendants and their agents, employees, and successors from forcing a prisoner as part of his work duties to handle or distribute foods that violate his religious beliefs. (*Id.* at PageID.132.)

RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless that burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). RLUIPA does not authorize suits for money damages against prison officials in their individual capacity. *Haight v. Thompson*, 763 F.3d 554, 567–70 (6th Cir. 2014). And it does not permit damages claims against prison officials in their official capacities. A suit against an individual in his or her official capacity is equivalent to a suit brought against the governmental entity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). In *Sossamon v. Texas*, 563 U.S. 277 (2011), the Supreme Court held that the RLUIPA did not abrogate sovereign immunity under the Eleventh Amendment. *See also Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009) ("[T]he Eleventh Amendment bars plaintiff's claim for monetary relief under RLUIPA.").

Although the statute permits the recovery of "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), monetary damages are not available under RLUIPA. Thus, to the extent Plaintiff seeks money damages against Defendants in their official or personal capacities, those claims must be dismissed.

Defendants contend that Plaintiff's RLUIPA and official capacity claims for injunctive and declaratory relief are moot because Plaintiff is no longer confined at LCF. The Sixth Circuit has held that transfer to another correctional facility moots a prisoner's injunctive and declaratory claims. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (holding that a prisoner-plaintiff's claims for injunctive and declaratory relief became moot when the prisoner was transferred from the prison about which he complained); *see also Heyward v. Cooper*, 88 F.4th 648, 656–57 (6th Cir. 2023) (declaring that the prisoner's RLUIPA claim was moot because the prisoner had "transferred facilities and 'his requests were directed specifically at' [the prior facility's] officials 'and were not targeted at' [the state department of corrections] 'programs as a whole.'") (quoting *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) (quoting *Kensu*)).[6] Plaintiff responds that his claims seeking injunctive and declaratory relief are not moot because other facilities in which he may be incarcerated are subject to the same MDOC policy and he may be assigned to food service and subjected to the same acts that violate his sincerely held religious beliefs. (ECF No. 46 at PageID.305–06.)

---

[6] In their reply, Defendants argued that Plaintiff had already effectively received the injunctive relief he seeks because in August 2022, he received a permanent medical restriction from work in food service. (ECF No. 50 at PageID.389 (citing ECF No. 50-20).) In his surreply, Plaintiff presented evidence that the restriction set forth in the August 2022 health work assignment clearance was not, in fact, permanent, as Plaintiff was subsequently cleared to work in food service at Saginaw Correctional Facility in January 2024 and at the Thumb Correctional Facility in August 2024. (ECF. No. 55 at PageID.474; ECF Nos. 56-1–56-3.)

Plaintiff's claims requesting injunctive and declaratory relief are moot as a result of his transfer out of LCF to a different facility. Although Plaintiff's claims involve an MDOC Policy, he does not challenge the validity of the policy itself. Rather, he alleges in his amended complaint that Defendants' incorrect interpretation of Policy Directive 05.01.100 resulted in the violation of Plaintiff's constitutional rights. (ECF No. 30 at PageID.125 ("The incorrect interpretation of this policy has oppressed, defiled the Plaintiff and any similar applications of it will further oppress faith communities throughout the State of Michigan prisons."), 131 ("wrongful interpretation and implementation of PD 05.01.100" was an unlawful practice that infringed Plaintiff's constitutional rights").) Plaintiff also admitted that other MDOC facilities "did not force him to handle or serve haram foods." (ECF No. 46 at PageID.305.) In fact, Plaintiff testified that unlike other facilities, the food serving line at LCF put the main course with the haram food on first and then passed the tray down the line for vegetables, whereas the initial person in line at other facilities handles that vegetables, or halal food, and the tray is passed down the line for the meat, or haram food. (ECF No. 37-7 at PageID.223.) Given that Plaintiff's claims focus on Defendants' incorrect interpretation of the policy and are based on events that occurred solely at LCF, his claims for injunctive and declaratory relief are not moot. Accordingly, the RLUIPA claim and official capacity claims seeking injunctive and declaratory relief should be dismissed.

### C.     Eighth Amendment Claim

In his amended complaint, Plaintiff mentioned the Eighth Amendment in the introduction, but he failed to actually allege an Eighth Amendment claim or to set forth how Defendants' alleged conduct violated the Eighth Amendment. Defendants contend that any such claim must be dismissed because simply reciting a constitutional provision is insufficient to set forth a claim. Plaintiff fails to respond adequately to Defendants' argument that he failed properly to allege an

13

Eighth Amendment violation in his amended complaint and cannot now craft one for the first time when responding to their motion for summary judgment. In addition, Plaintiff fails to identify conduct by any Defendant that falls within the Eighth Amendment's prohibition on cruel and unusual punishment. *See, e.g., Rhodes v. Chapman*, 452 U.S. 337, 348 (1981) (the Eighth Amendment is concerned only with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement"). Finally, Plaintiff's reliance on *Franklin v. Lockhart*, 890 F.2d 96 (8th Cir. 1989), is misplaced. *Franklin* involved an appeal from an order dismissing the plaintiff's complaint for failure to state a claim. The Eighth Circuit found that the plaintiff had alleged valid First Amendment free exercise and Eighth Amendment claims. The plaintiff alleged that, as part of the assigned work, he was required to handle manure and dead animals in violation of his religion. For his Eighth amendment claim, the plaintiff alleged that he was subjected to cruel and unusual punishment because he was required to work beyond his physical capacity. *Id.* at 97. Plaintiff makes no such allegation here. Thus, Plaintiff fails to establish an Eighth Amendment claim.

### D. Equal Protection

Plaintiff alleges that all Defendants violated his right to equal protection under the Fourteenth Amendment by treating him differently than other prisoners working in food service. (ECF No. 30 at PageID.130–31.) He alleges that Defendants gave other prisoners "work duties in food service that did not compromise their beliefs, medical or age disabilities." (*Id.* at PageID.125.)

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A state practice requires strict

14

scrutiny if it interferes with a fundamental right or discriminates against a suspect class of individuals. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). An individual's right to the free exercise of religion is a fundamental right. *City of Cleburne*, 473 U.S. at 440. The threshold element of an equal protection claim, however, is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)). "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Village of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018).

Defendants contend that they are entitled to summary judgment on this claim because Plaintiff was treated the same as other prisoners and in accordance with Policy Directive 05.01.100. They note that food service employees have no control over prisoner work assignments or prisoner requests for religious accommodations and that all work assignments originate with classification. (ECF No. 37-3 at PageID.193–95; ECF No. 37-6 at PageID.215; ECF No. 37-10 at PageID.242.) Instead, food service employees are responsible for orienting, training, and supervising prisoners assigned to work in food service. (ECF No. 37-3 at PageID.194; ECF No. 37-6 at PageID.215; ECF No. 37-10 at PageID.242.) Defendants also note that Plaintiff was treated no differently than other prisoners who were assigned to work in food service because all prisoners

who received food service assignments were required to begin on the serving line. (ECF No. 37-2 at PageID.189–90; ECF No. 37-3 at PageID.194; ECF No. 37-6 at PageID.215; ECF No. 37-10 at PageID.242.) Finally, Defendants contend that Plaintiff has no evidence to support his claim of unequal treatment.

In response, Plaintiff submits several declarations from other prisoners claiming that Defendants accommodated their similar beliefs about serving haram foods to others by either assigning them to jobs outside of food service or assigning them to duties within food service that did not require them to violate their beliefs. (ECF Nos. 46-6–46-11, 46-14; ECF Nos. 49-1 and 49-2.) In reply, Defendants contend that Plaintiff's purported comparators are not similarly situated to Plaintiff for various reasons, as set forth in Losinski's second declaration. (ECF No. 50-3.) The following prisoners are at issue:

### 1. Donnie Bobo #186601

Bobo claims that he transferred into LCF in the fall of 2018 and was classified by Losinski. He claims that during classification, he told Losinski that he had a medical issue that prevented him from working in food service.[7] He further claims that, even though health care later cleared him to work in food service, Losinski assigned him to a recreation worker position. He further states that Losinski did not inform him about "OO" status, although he does not claim that he ever refused to work. (ECF No. 46-10.) Losinski states that she classified Bobo in February 2019, not the fall of 2018, as he did not arrive at LCF until February 2019. (ECF No. 50-3 at PageID.408; ECF No. 50-4.) Regardless, unlike Plaintiff, although Bobo indicated he had no medical conditions, healthcare did not clear him to work in the kitchen, whereas Plaintiff was cleared to

---

[7] Bobo also testifies to a statement by another prisoner. The statement is hearsay and thus is not considered.

work in the kitchen. Thus, Bobo was added to another institutional needs work assignment pool. (ECF No. 50-3 at PageID.408; ECF No. 50-4.) Bobo and Plaintiff are thus not similarly situated.

### 2.      Gregory Washington #165469

Washington transferred into LCF in March of 2019 and was classified about a week later. Washington testifies about a statement by another prisoner about being on the vegan menu, which is hearsay and will not be considered on summary judgment. In any event, the prisoner on the vegan menu was not similarly situated to Plaintiff because Plaintiff was not on the vegan menu.[8] *See Ali v. Adamson*, No. 1:21-cv-71, 2024 WL 277517, at *4 (W.D. Mich. Jan. 25, 2024). Like Bobo, Washington also states that he was never informed about "OO" status, but he does not claim that he ever did anything that could be considered a refusal to work that might elicit counseling about the status. (ECF No. 46-9.) Washington also differed from Plaintiff in that he had a Food Service Tech Certification and specifically requested to work in the kitchen because he had been the "Lead Baker" at another facility. Thus, he was designated as high priority for a kitchen assignment. (ECF No. 50-3 at PageID.408; ECF No. 50-5.) This is consistent with policy, which provides that "[a] prisoner may be given preference for an assignment for which s/he has related experience or training," and that "[i]f an appropriate work assignment or program vacancy does not exist at the time of the initial classification, the prisoner shall be placed on a waiting list (i.e., "pool") for the assignment or program." Mich. Dep't of Corr. Policy Directive 05.01.100 ¶ I. Washington and Plaintiff are not similarly situated.

---

[8] Whether a prisoner was on the vegan menu was significant because it appears that such prisoners were not assigned positions in which they would have to handle food that was inconsistent with the food on the vegan menu. (ECF No. 46-11 at PageID.361.)

### 3. Opelton Kelly #225090

Kelly claims that he arrived at LCF in August 2020 and was classified by Losinski. He claims that he was willing to work food service but told Losinski that his religious beliefs prevented him from serving improperly slaughtered meats, and that Losinski informed him that it would not be a problem and to inform food service personnel about the issue. He claims that later, an officer made a call on his behalf resulting in reassignment to a unit porter position. Thus, it appears that he never worked in food service. (ECF No. 46-7.) Losinski notes that she did not classify Kelly because she was not serving as the Classification Director at that time. Rather, she was moved into the role of Acting Administrative Assistant from September 2019 through September 2020, and Patrick Daniels served as acting Classification Director during that time. (ECF No. 50-3 at PageID.408–09.) Kelly's Program Classification Report, which Patrick Daniels signed on September 3, 2020, confirms that Losinski was not involved in classifying Kelly. (ECF No. 50-6.) Thus, Kelly is not similarly situated to Plaintiff.

### 4. Thomas Askia

Askia states that he arrived at LCF in August 2020 and was called out for orientation about a week later. He claims that he was not informed that he would be deemed unemployable if he refused to work, but does not claim that ever did anything that would elicit counseling about "OO" status. (ECF No. 46-14.) As Defendants note, there is no MDOC information for a "Thomas Askia," as a search of the MDOC's publicly-available Offender Tracking System returns no information for this alleged prisoner. In any event, he is not similarly situated to Plaintiff as Losinski was not the Classification Director during this time, and nothing in his declaration shows that he was treated differently than Plaintiff. (ECF No. 50-3 at PageID.409; ECF No. 50-6.)

18

**5.      Anthony Hoffman #783994; Andrew Blount #255961; Johnny Murphy #177215**

None of these prisoners is similarly situated to Plaintiff, as it appears that they were on the vegan menu, while Plaintiff was not. (ECF No. 46-11; ECF No. 49-1 at PageID.382; ECF No. 49-2 at PageID.385.)

**6.      Leo Abby #529263; Larry Caver #200563; Monya Tate #272129**

Abby states that during the spring of 2018, he informed Losinski that his religious beliefs prevented him from serving unlawful foods to others, and she responded that she understood and would assign him to a porter position. He claims that a month or two later, he began working as a unit porter. (ECF No. 46-6.)

Caver claims that he transferred to LCF in 2017 and that during a classification interview he informed Losinski that, due to his religious beliefs, he could not handle unlawful food or serve it to others. He claims that Losinski responded that it would not be an issue because the MDOC no longer served pork, but he told her that the restriction was not limited to pork but included all unlawful foods. Caver claims that when Losinski asked him if he was refusing to work, he responded, "No, I will work, but I can['t] do jobs that violate my beliefs." Losinski told him that she would still classify him to food service and when food service called him he should share his concerns with them and they would accommodate his beliefs. It appears, however, that he never had to work in food service because soon thereafter, a unit officer helped him obtain a unit porter's position. (ECF No. 46-8.)

Tate states that he transferred to LCF in September 2018, and while at classification, Losinski told him that he had to work in food service for six months before he would be permitted to obtain a different job. He states that he told Losinski that other facilities had three institutional

19

needs jobs, but Losinski responded that she did not care about what other facilities did because this was how it was done at LCF. Tate further states that Losinski never warned him about "OO" status if he refused to work food service. (ECF No. 46-15.)

Defendants contend that Abby, Caver, and Tate are not similarly situated to Plaintiff because Losinski did not classify them. In her second declaration, Losinski states that she did not become Classification Director until December 18, 2018, so any prisoners claiming that she classified them prior to that date are mistaken.[9] (ECF No. 50-3 at PageID.408.) While this difference would render Abby, Caver, and Tate not similar to Plaintiff, a genuine issue of material fact remains as to whether Losinski classified these prisoners, all of whom swore under oath that Losinski classified them. Unlike the situation with prisoner Kelly, in which Defendants provided corroborating evidence showing that Patrick Daniels classified Kelly (ECF No. 50-6), there is no similar evidence supporting Losinski's claim that she could not have classified these prisoners prior to December 2018.

Nonetheless, I conclude for other reasons that prisoners Caver and Tate are not similarly situated to Plaintiff. As noted, Caver claims that a unit officer—not Losinski—helped him obtain the unit porter position. Plaintiff and Caver were thus dissimilar in this respect. And, as was the case with Caver, Plaintiff alleges that when he told Losinski that a job in food service might conflict with his religious beliefs, she told him that he should raise his concerns with food service

---

[9] Plaintiff claims in his surreply that Losinski committed fraud on the Court because she swore in her initial declaration that she conducted Plaintiff's classification in August 2018, but claims in her second affidavit that she did not perform any classification duties until December. (ECF No. 55 at PageID.476.) This argument lacks merit because Plaintiff misconstrues Losinski's statement in her first declaration, that "I did not treat Mr. Ali differently than I treated anyone else. Every prisoner who came to [LCF] went through exactly the same classification process." (ECF No. 37-2 at PageID.191.) Nowhere in her first declaration does Losinski state that she classified Plaintiff in August 2018.

20

and they would schedule him according to his beliefs. (ECF No. 46-2.) Losinski thus treated Caver and Plaintiff alike in this regard. As for Tate, he does not allege that his religious beliefs prevented him from doing anything in food service or, if he had such beliefs, that he raised them at any time to Losinski or anyone in food service. Thus, Tate also is not similarly situated to Plaintiff.[10]

In light of the remaining dispute of fact concerning the Abby declaration, I recommend that the Court deny Defendants' motion for summary judgment on the equal protection claim, but only as to Defendant Losinski because there is no evidence that Defendants Torrey, Palmateer, or Knight treated Plaintiff differently than any similarly situated prisoner.

### D.      Retaliation Claims

Plaintiff alleges that Defendants retaliated against him in response to his exercise of his religious beliefs by threatening him with "OO" sanctions and misconduct tickets if he refused to work on the food line.

The requirements for a valid First Amendment retaliation claim are well established. To prove such a claim, a plaintiff must establish that: (1) he engaged in protected conduct; (2) the defendant took an adverse action against him "that would deter a person of ordinary firmness from continuing to engage in that conduct;" and (3) the adverse action was taken (at least in part) because of the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In addition, a plaintiff must be able to prove that the protected conduct was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Smith v. Campbell*, 250 F.3d 1032,

---

[10] In his sur-reply, Plaintiff complains about lack of access to MDOC records and prisoner witnesses. However, he fails to submit an affidavit or declaration pursuant to Federal Rule of Civil Procedure 56(d) identifying the specific evidence and stating why it would create a genuine issue of material fact supporting denial of Defendants' motion.

1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff can establish the protected conduct element of his claim. *See Blaylock v. Burgess*, No. 1:24-cv-593, 2024 WL 3100677, at *4 (W.D. Mich. June 24, 2024) (noting that "practice of religious beliefs can certainly qualify as protected conduct"); *Mease v. Wonnacott*, No. 2:20-cv-176, 2023 WL 11896857, at *6 n.11 (W.D. Mich. Oct. 23, 2023), *report and recommendation adopted*, 2024 WL 3391148 (W.D. Mich. July 12, 2024) (noting that "[s]everal courts have determined, or at least suggested, that the exercise of religious beliefs falls within the scope of protected conduct for the purposes of First Amendment retaliation claims"). His claim fails, however, because he cannot establish adverse action.

An action is adverse if it would deter a person of ordinary firmness from engaging in that conduct. *See Thaddeus-X*, 175 F.3d at 394. Defendants contend that Plaintiff cannot establish an adverse action because he does not allege that he actually received a misconduct report or was placed on unemployable or "OO" status. Defendants further argue that, rather than retaliatory threats, as required by policy, they simply advised Plaintiff that he could be placed on unemployable status if he refused to work. Defendants contend that their warnings were not adverse because, after being advised of the consequences of refusing his work assignment, Plaintiff chose to work. (*Id.* at PageID.170–71.) Plaintiff counters that he has sufficiently established adverse action because case law holds that a misconduct ticket and/or "OO" status can be sufficiently adverse to deter a prisoner from engaging in protected conduct. (ECF No. 46 at PageID.308–09.)

Beginning with unemployable, or "OO" status, Plaintiff fails to cite a single case holding that placement on such status amounts to adverse action for purposes of a retaliation claim. In fact,

a judge in this district reached the opposite conclusion, observing that "[c]lassifying an inmate as unemployable is not an action that would deter a person of ordinary firmness." *Jones v. Smolinski*, No. 1:09-cv-633, 2010 WL 7370364, at *5 (W.D. Mich. Aug. 31, 2010), *report and recommendation adopted*, 2011 WL 3847013 (W.D. Mich. Aug. 30, 2011).

Plaintiff cites *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010), for the proposition that "actions that result in more restrictions and fewer privileges for prisoners are considered adverse." In *Hill*, the plaintiff alleged that he was placed in segregated housing after he filed a grievance. While it was unclear whether this type of housing was comparable to administrative segregation, which the Sixth Circuit had previously determined to amount to adverse action, the court found that the plaintiff's allegation that his placement in segregated housing had increased his restrictions and decreased his privileges rendered his claim plausible. *Id.* at 473–74. The Sixth Circuit followed *Hill* in *Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018), in determining whether the seven-day loss of privileges the plaintiff received as punishment for his Class II misconduct amounted to more than inconsequential action. *Id.* at 266–67. The court found that the deprivation of privileges the plaintiff suffered was at least as severe as punishments that had amounted to adverse action in other cases. It observed that because privileges "are all that prisoners really have," a deprivation of privileges is not "inconsequential." *Id.* at 267.

In my judgment, placement on unemployable status with its attendant consequences is not punishment that could constitute adverse action, but rather is simply a means to ensure that those prisoners who choose not to work (a choice allowed by policy) are not treated more favorably than those who do. The policy ensures that "[p]risoners classified as unemployable shall not be permitted to participate in any more leisure time activities than those who work full time." Mich. Dep't of Corr. Policy Directive 05.01.100 ¶ DD. Because "OO" status precludes non-working

prisoners from engaging in leisure activities during time they would be working an assigned job, there is no deprivation of privileges they would otherwise enjoy. (ECF No. 37-2 at PageID.190.) But even if "OO" status could be considered punishment, there is no dispute that Plaintiff was never placed on that status. He alleges only that Defendants "threatened" him with "OO" status, but policy explicitly requires that "appropriate staff shall ensure the prisoner understands the consequences of [unemployable status]" prior to reclassifying the prisoner as unemployable. Mich. Dep't of Corr. Policy Directive 05.01.100 ¶ CC. Even if characterized as a "threat," being advised about the consequences of a decision to not work, as required by policy, would not deter a person of ordinary firmness from exercising his rights.

Plaintiff also claims that Defendants threatened him with a misconduct ticket for disobeying a direct order if he refused to work on the serving line. (ECF No. 50-8 at PageID.437.) Citing *Scott v. Churchill*, 377 F.3d 565 (6th Cir. 2004), Plaintiff contends that the mere threat to issue a misconduct ticket amounts to adverse action. While the *Scott* court did observe that "the mere potential threat of disciplinary sanctions is sufficiently adverse action to support a claim of retaliation," *Id.* at 571, that statement must be considered in light of the facts in *Scott* as well as its procedural posture. Scott alleged that, upon arriving for a meeting with a hearing officer on a previous misconduct, he encountered Defendant Bair, who made a remark about the misconduct. When Scott asked Bair to explain the remark, Bair responded, "You don't know who you're f___ing with," grabbed the back of Scott's neck, and continued, "You want to f___ with me, b____!" *Id.* at 567. Scott filed a grievance against Bair later that day based on this exchange. The following day, Bair issued Scott a major misconduct for insolence. At the subsequent hearing, the officer did not sustain the charge because he found Bair's credibility questionable given the timing between Scott's grievance and the issuance of the misconduct, as well as an affidavit from another

24

prisoner who claimed to have overheard Bair's conversation with another guard who suggested that Bair issued Scott a false misconduct ticket. *Id.* at 567–68. The case was before the Sixth Circuit on Bair's appeal of denial of qualified immunity. Bair argued that the law was not clearly established because, unlike the plaintiffs in two prior cases, *Gibbs v. Hopkins*, 10 F.3d 373 (6th Cir. 1993), and *Newsom v. Norris*, 888 F.2d 371 (6th Cir. 1989), Scott suffered no harm. The court rejected the argument, observing that "[c]ircumstances outside Bair's control stopped his attempt at retaliation from being perfected, but had Bair performed the exact same action and the hearing officer not cleared Scott of misconduct charges, Scott would have faced disciplinary segregation or the loss of good-time credits—which would necessarily be an actionable harm after *Gibbs*, where plaintiff made out a claim after having been kept in administrative segregation." *Id.* at 571. The court also found that the Sixth Circuit's prior decision in *Cale v. Johnson*, 861 F.2d 943 (6th Cir. 1988)—in which the court found that the defendant's issuance of a misconduct charge based on false evidence he planted on the prisoner in retaliation for a complaint about prison food met the "shocks the conscience" standard—was determinative of Bair's appeal. In light of these circumstances, the court observed that "*Cale*, decided in 1988, clearly establishes that the mere potential threat of disciplinary sanctions is sufficiently adverse action to support a claim of retaliation." *Id.* a 571–72.

Because Defendants did not issue Plaintiff a misconduct ticket, let alone a false misconduct ticket, *Scott* does not support Plaintiff's claim. That case does not hold that a mere threat to file a misconduct ticket is sufficiently adverse to deter the exercise of First Amendment rights. *See Cottrell v. Hamlin*, No. 2:20-cv-12886, 2021 WL 2822932, at *1–2 (E.D. Mich. July 7, 2021) (rejecting the plaintiff's assertion that *Scott* stands "for the proposition that a mere threat to file [a] disciplinary ticket satisfies the adverse action element as a matter of law"). In fact, accepting

Plaintiff's allegations as true, Defendants did not threaten a false misconduct ticket, but merely explained the consequences (a misconduct for disobeying a direct order) if Plaintiff refused to work on the serving line as directed. Such *de minimis* action does not support a cognizable constitutional injury. *Thaddeus-X*, 175 F.3d at 396; *see also Cottrell*, 2021 WL 2822932, at *2 (holding that "the mere threat of filing a misconduct charge in the course of arguing with another prisoner . . . without following through and actually filing the charge—was a *de minimis*, literally inconsequential statement that would not deter a person of ordinary firmness from exercising his rights"); *Sublett v. McAlister*, No, 5:16-CV-138, 2020 WL 695655, at *4 (W.D. Ky. Feb. 11, 2020) (granting qualified immunity because "[a] statement suggesting discipline for a legitimate violation of policy cannot equate to an actionable threat").

Accordingly, in addition to this claim being unexhausted, or should the court reject the recommendation that the retaliation claim be dismissed on exhaustion grounds, I recommend that the Court dismiss it on the merits based on lack of adverse action.

### E. Free Exercise Clause Violation

In his final federal claim, Plaintiff alleges that Defendants violated his First Amendment right to freely exercise his religion by requiring him to work in the serving line serving haram food to others. To demonstrate that this right has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) his belief is sincerely held, and (3) Defendants' behavior infringed upon his practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same). Even if Plaintiff makes this showing, the analysis must also consider whether the limitation on his rights is reasonably related to legitimate penological interests. *Arauz v. Bell*, 307 F. App'x 923, 928 (6th Cir. 2009).

It is well established that a prisoner does not forfeit all of his constitutional rights, including his right to free exercise of religion. *See Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (stating that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty"). On the other hand, it is well established that incarceration legitimately requires restrictions on many rights and privileges that prisoners retain. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

> [S]uch a standard is necessary "if prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. North Carolina Prisoners' Union*, 433 U.S. [119,] 128, 97 S. Ct. [2532, 2539 (1977)]. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S. [396], 407, 94 S. Ct. [1800, 1808 (1974)].

*Turner v. Safley*, 482 U.S. 78, 89 (1987). In other words, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations," *Bell v. Wolfish*, 441 U.S. 520, 545 (1979), as operating a prison is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85.

In *Turner*, the Court articulated four factors to assess the reasonableness of a prison regulation: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact accommodation of the asserted constitutional right will have on prison staff and inmates; and (4) whether there are other

readily available alternatives at a de minimis cost to valid penological interests. *Id.* at 89–91. This standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Flagner*, 241 F.3d at 484 (quoting *Turner*). Instead, the issue is simply whether the policy at issue is reasonably related to a legitimate penological interest. *Id.* A plaintiff must show that the regulation, as applied by each defendant, was not reasonably related to legitimate penological objectives. *Murphy v. Karber*, No. 1:14-cv-269, 2017 WL 4160949, at *13 (W.D. Mich. Sept. 20, 2017) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.")).

Defendants contend that they are entitled to qualified immunity on this claim. I agree. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.*

(citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "'[C]learly established law' may not be defined at . . . 'a high level of generality.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *al-Kidd*, 563 U.S. at 742). "[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* (quoting *White*, 580 U.S. at 79). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019).

As set forth above, Defendants followed Policy Directive 05.01.100 in assigning Plaintiff to work in food service in a position that included working on the serving line. Contrary to Plaintiff's assertion, they did not misinterpret the policy. Instead, they fully complied with the policy and LCF's procedure for assigning prisoners to prison jobs by selecting Plaintiff to work in food service when he was next in line for a job in food service. Defendants also complied with policy by informing him of "OO" status and allowing him to decide for himself whether or not to work. The Sixth Circuit has held that "a prison official who relies on a facially valid regulation" is entitled to qualified immunity "unless he knows or should know that the regulation violates a

well established constitutional right consisting of the particular act for which he inflicts punishment." *Wolfel v. Morris*, 972 F.2d 712, 719–20 (6th Cir. 1992) (internal quotation marks omitted). Here, Defendants had no reason to believe that following the policy in Plaintiff's circumstances violated his clearly established constitutional rights.

More importantly, Plaintiff fails to cite any authority that clearly established at the time of the events in question that prisoners have a right not to serve food that violates their religious beliefs or even pass a tray containing such food to others. The Court also has found no such authority. The cases Plaintiff cites that pertain to a Muslim prisoner's right to consume a halal diet, *see Dowdy-El v. Caruso*, No. 06-11765, 2012 WL 8170409, at *11–12 (E.D. Mich. July 24, 2012), right to avoid handling pork, *see Williams v. Bitner*, 455 F.3d 186, 191–94 (3d Cir. 2006), and right to receive an adequate diet without violating the prisoner's religious dietary restrictions, *see Alexander v. Carrick*, 31 F. App'x 176, 179 (6th Cir. 2002) (per curiam), would not have provided Defendants fair notice that requiring Plaintiff to work on the serving line would violate his clearly established rights, particularly where Plaintiff always had the option to refuse to work.[11] The same is true of the dissent's citation in *Welch v. Spaulding*, 627 F. App'x 479, 485 (6th Cir. 2015), of an article on a legal blog titled *Prison officials' ordering Muslim prisoner-cook to handle pork may violate the Free Exercise Clause*. Accordingly, Defendants are entitled to qualified immunity on Plaintiff's free exercise claim.

### F.     Michigan Constitution

In addition to his federal claims, Plaintiff alleges a state-law claim against all Defendants for violation of Article I, Section 4 of the Michigan Constitution, which provides:

---

[11] As Defendants note, there is no evidence that Plaintiff was required to touch or consume pork. In fact, his own evidence shows that as of 2017 the MDOC no longer served pork. (ECF No. 46-8 at PageID.351.)

> Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. The civil and political rights, privileges, and capacities of no person shall be diminished or enlarged on account of his religious belief.

Mich. Const. 1963, art. 1, § 4. Plaintiff alleges that Defendants violated this provision by requiring him to work on the serving line. (ECF No. 30 at PageID.131.)

Defendants contend that they are entitled to statutory immunity from liability for damages under Michigan's Governmental Tort Liability Act (GTLA), Mich. Comp. Laws § 691.1401, *et seq*. I find it unnecessary to address GTLA immunity because, as Defendants also note, under Michigan law, damages are unavailable in a claim against individual government employees for violations of the Michigan Constitution.

In *Jones v. Powell*, 462 Mich. 329 (2000), the Michigan Supreme Court said that its decision in *Smith v. Department of Public Health*, 428 Mich. 540 (1987), "provides no support for inferring a damage remedy for a violation of the Michigan Constitution in an action against a municipality or an individual government employee." *Id.* at 335. The court noted that the issue in *Smith* was whether such a remedy should be inferred against the state, which is not subject to liability under 42 U.S.C. § 1983. *Id.* at 335–36. The court said that the concern for a lack of remedy against the state in a Section 1983 action was not present in a case against a municipality or an individual because a plaintiff may sue such parties in state or federal court under Section 1983. *See id.* at 337. In the instant case, Plaintiff sues individuals, not the state, and thus has a remedy under Section 1983. Therefore, he may not assert a claim against Defendants under the Michigan

Constitution.[12] *See Catlett v. Washington*, No. 20-13283, 2021 WL 3363394, at *3 (E.D. Mich. Aug. 3, 2021) ("[I]n light of Jones, Plaintiffs may not pursue damages against Defendant Washington on claims arising under the Michigan State Constitution."); *HRSS, Inc. v. Wayne Cnty. Treasurer*, 279 F. Supp. 2d 846, 851 (E.D. Mich. 2003) (noting that under *Jones* no damages remedy was available because the plaintiff had another avenue of relief against the county and its officials, namely an action under Section 1983); *Darden v. City of Ann Arbor*, No. 227063, 2002 WL 410209, at *1 (Mich. Ct. App. Mar.15, 2002) (per curiam) ("Here, plaintiff sought damages for an alleged violation of the Michigan Constitution by a municipality and employees of the municipality, and plaintiff's complaint does not allege a cause of action under § 1983. Therefore, pursuant to the holding in *Jones*, plaintiff's constitutional damage claim is barred and cannot be maintained against any of the defendants.").

As for injunctive relief, as noted above, Plaintiff's request for such relief is moot for the reasons set forth above. Accordingly, I recommend that the Court grant Defendants' motion as to this claim.

### IV. Conclusion

For the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment (ECF No. 36) be **granted** as to Plaintiff's RLUIPA, retaliation (with prejudice or, alternatively, without prejudice if the Court concludes that the claim has merit but is unexhausted), Eighth

---

[12] To the extent Plaintiff contends that his official capacity claims against Defendants for violation of the Michigan Constitution are against the State of Michigan, they would be barred in this Court by the Eleventh Amendment. *See McCormick v. Miami Univ.*, 693 F.3d 654, 664 (6th Cir. 2012) (noting that the Eleventh Amendment bars state-law claims against state officials in their official capacity). Moreover, the State of Michigan has not waived its Eleventh Amendment immunity. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). Thus, the official-capacity state-law claims should be dismissed without prejudice.

Amendment, free exercise, and state-law claims and his equal protection claim against Defendants Knight, Palmateer, and Torrey but **denied** as to his equal protection claim against Losinski.

Dated: December 9, 2024          /s/ Sally J. Berens
                                                 SALLY J. BERENS
                                                 U.S. Magistrate Judge

### NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).